UNITED STATES DISTRICT COURT
DISTRICT OF NORTH DAKOTA
SOUTHEASTERN DIVISION

FILED
DEC 21 2005
EDWARD J. KLECKER, CLERK
U.S. DISTRICT COURT-NORTH DAKOTA

Hugh L. Devine, )
)
        Plaintiff, )
)
v. ) Civil No. A3-02-128
) (Consolidated with Civil No. A3-04-54)
)
United States of America, )
)
        Defendant. )
_____)

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In 1996, defendant Veteran's Administration of the United States of America ("United States" or "VA") performed a surgical procedure on plaintiff Hugh L. Devine ("Devine") to insert a Bard Port-A-Cath into his central vena cava for the delivery of chemotherapy medication. VA surgeons removed the catheter September 3, 1997, but they left behind a fragment of catheter. This segment migrated through Devine's heart and ultimately lodged in his left pulmonary artery, where it was discovered nearly four years later. The United States admitted that the standard of care required it to remove the entire catheter, that it intended to remove the entire catheter, and that it failed to remove the entire catheter. Based on the United States' admission, the court granted partial summary judgment to Devine, finding that as a matter of law the conduct of the United States did not meet the applicable standard of care. The remaining issues of causation and damages were tried to the court. This memorandum opinion contains the court's findings of fact and conclusions of law.

1

**Discussion**

I.  **Factual Background**

Devine is a decorated veteran of the U.S. Marine Corps, having served in the Vietnam War. He enlisted in the Marines in 1968 and was deployed to Vietnam in February 1969 as a Private 1st Class. He testified he was promoted to squadron leader and served in that capacity for approximately eight months. During his deployment Devine was injured on two occasions, the first involving shrapnel in his left arm and shoulder from friendly fire. After returning to combat he was injured in a land mine explosion. After spending seven months in a military hospital Devine received a permanent disability retirement from the military. (Ex. 62). His injuries include loss of sight in his right eye, 50% hearing loss, and shrapnel wounds in his leg and chest. In 1978 he received a prosthetic eye at the VA Hospital in Minneapolis. He received disability at a rate of 80% medical, 20% unemployment, until 2003 when it was increased to 100% medical. Ex. 64.

Devine married in 1972. He has three children and three grandchildren. He was divorced in 2000. He testified he is a recovering alcoholic and very active in Alcoholics Anonymous, not having had a drink in more than 25 years. Devine also testified he used to smoke but stopped in 1991.

In 1996 Devine sought medical treatment in Grand Forks. At that time he was diagnosed with cancer of the appendix, a very rare form of cancer. He underwent surgery in Grand Forks and started chemotherapy treatment there. He then transferred to the VA Hospital in Fargo for coverage reasons. On November 22, 1996, doctors at the VA inserted a Bard Port-A-Cath for the purpose of delivery of the chemotherapy medicines. Devine's cancer was successfully treated. On September 3, 1997 doctors at the VA surgically removed the Port-A-Cath from Devine's chest, but they failed to remove the entire catheter. Neither the VA nor Devine were aware of the

2

remaining fragment. On October 2, 2001, Devine went to the Los Angeles VA for treatment with a plastic surgeon to correct deficiencies in his prosthetic eye.[1] His preoperative screening included a chest x-ray, which revealed the catheter fragment in his pulmonary artery. Devine testified that the physician in Los Angeles advised that the catheter fragment should be removed prior to any other surgery to minimize "trouble with the lungs." Ex. 33. Additional records from Los Angeles state, "There is note made of the fact that there is a vascular catheter in the left pulmonary artery. Although this has likely been present for a long time, it should likely be removed prior to upcoming eye surgery. I am going to admit him to the hospital so that this can be addressed prior to him going back to Arizona." Ex. 33. Devine left the hospital without further discussion and returned to Arizona.

Devine then contacted his primary care provider at the Tucson facility, Physician Assistant Margaret Devries. Ex. 35. She scheduled an appointment with the pulmonary department and Devine had another chest X-ray on October 5, 2001. Ex. 36. Dr. Freels noted that a portion of the catheter extended into both the upper and lower branches of the left main pulmonary artery. He noted that the catheter fragment has been there since 1998, stating:

> it is most likely thrombosed off and/or has severe fibrosis and would
> be a great risk to the pt to have it removed. We would also suggest
> NOT to be anticoagulated at this time given the longevity of the
> placement per pt report and the low probability that it will move.
> Do suggest a repeat CXR in 6,12,24 to evaluate placement to make
> sure it has not shifted and to have on file to that fact.

---

[1] Devine wintered in Arizona in 1997 and 1998 and moved there on a permanent basis in 1999. He went to Los Angeles at the request of the VA in Tucson because the type of treatment necessary was not available in Tucson.

3

Ex. 36. Dr. Freel's treatment note discusses Devine's complaint of shortness of breath, but suggests this more likely is related to circulation problems than cardiac issues. He noted that Devine stated that "he may have chest pain but unsure if it is because he knows that it is there."

In July 2002 Devine again returned to the VA in Arizona for an exam by Dr. Sammy Campbell. Dr. Campbell's notes indicate Devine is "worried about the plastic catheter tip in him." After a review of the films, Dr. Campbell concluded the "catheter tip in left pulmonary artery and unchanged location although last film in April 2002." Dr. Campbell advised, "Nothing should be done at this point, reassured him that it is best to leave the catheter in." Ex. 37, 103.

Sometime in early April 2004, Devine received a letter identified as a Pre-Procedure letter stating his physician Dr. M. Devries had referred him to the Radiology Department for a catheter removal procedure on April 28, 2004. Ex. 38. Devine contacted the VA, expressing his confusion, since Dr. Campbell had advised the catheter fragment was best left alone. Dr. Campbell's subsequent note in Devine's medical records echoed that confusion. Dr. Campbell wrote that he did not order removal of the pulmonary catheter, but rather asked that invasive radiologists evaluate for possible removal. Dr. Campbell had intended no contact be made to Devine about this referral unless the radiologists thought they could do the procedure. The fact that the radiology department scheduled the procedure surprised Dr. Campbell as much as it surprised Devine. After speaking with Devine and advising him not to have surgery, Dr. Campbell confirmed that the planned procedure was a "CT angio-gram to see if radiology guided retrieval would be possible." Ex. 39. Devine testified that this mis-communication caused him a great deal of anxiety, adding to the stress caused by the presence of the catheter in the first place.[2]

---

[2]Devine testified at length about this incident and his communication with a technician in the radiology department. Understandably this "mix up," if in fact that is what it was, would be very

On July 28, 2004, Dr. Michael Habib at the VA in Southern Arizona examined Devine. Ex. 40. Dr. Habib noted that the "do nothing" course of action for the retained catheter fragment seemed acceptable "given its stability and time and place," but determined he should consult with an interventional radiologist to fully inform Devine of the possibilities. Dr. Habib noted Devine's anxiety about the catheter in his chest and suggested his complaints of chest pain have unclear etiology, stating, "I cannot exclude completely that this may be related to the catheter fragment." Ex. 40.

II. Physical Injury

Devine seeks damages for the physical effects the retained catheter has caused. He testified he has experienced various physical symptoms since learning of the catheter fragment, including shortness of breath and a tightness or squeezing feeling in his chest several times a day. In addition, Devine attributes a fainting spell in 1999 to the catheter's presence.

Both Devine and the United States presented expert testimony as to whether the migration itself caused any medical issues, and the future risks posed by the retained catheter. Predictably, their testimony represents polar opposites. After careful and thorough consideration of the evidence, summarized briefly here, the court finds a lack of credible medical evidence to support Devine's assertion that the migration and current location of the catheter fragment caused any of the physical symptoms of which he now complains. Further, the court finds the risk of future harm is negligible. Consequently, there is no proximate causation for Devine's claim of damages based on physical harm.

---

unsettling. However, it is not the basis for a malpractice action and in the court's opinion does not give rise to damages, in and of itself. It serves only to highlight the degree of Devine's emotional reaction to the presence of the catheter fragment.

5

Plaintiff's expert, Dr. Delmer Aitken, testified on direct examination that Devine suffered a loss of consciousness as a result of the catheter fragment, and that blood flow was temporarily cut off, causing a mild cardiac infarction. He testified there are risks of future problems, including arrhythmia, further migration, and infection due to the existence of a foreign body. Dr. Aitken explained that Devine is particularly vulnerable to infection because, as a cancer survivor, he has an increased risk of developing another cancer and undergoing further chemotherapy, which would diminish his ability to fight infection. Further, Dr. Aitken testified that if the fragment continues to migrate, Devine is at risk of developing pneumonia, and there is a possibility of chronic infection. He stated that it cannot be determined whether the fragment is incorporated into the vessel wall. Finally, Dr. Aitken testified that there is a "real risk" of blood clots, although he was not able to specify the degree of such risk. Dr. Aitken concluded his testimony on direct examination by stating that, to a reasonable degree of medical certainty, the existence of the catheter fragment in Devine's chest has impacted his health, increased his stress level and increased his risks of infection and pulmonary hypertension.

The court finds Dr. Aitken's testimony was significantly discredited on cross examination. Dr. Aitken was unable to quantify any of the identified potential risks, stating only that they are "real." He testified he could not put a "number" or "probability" on the amount of risk. Nor could he cite to any published materials indicating retained catheters cause problems. Further, Dr. Aitken testified that he does not believe the catheter fragment will cause problems in Devine's heart, but should the anterior tip "flip out," it could cause arrhythmia. Again he could not quantify the risk but testified it was in fact "real." In other words, Dr. Aitken was not able to say that any of the risks he identified were more probable than not to occur at any given time, or ever, admitting that to do so would be speculative. Additionally, the court finds significant the fact that

Dr. Aitken specifically deferred to an interventional radiologist as to whether or not the catheter should be removed, agreeing it is a clinical decision. Dr. Aitken is not qualified to express an opinion on Devine's mental health, but he repeatedly linked the stress caused by the retained catheter to Devine's physical health. It is the court's opinion such a diagnosis is best left to the professionals in the area of mental health, discussed later.

The United States' expert, Dr. Cory Teigen, presents a very different perspective. Dr. Teigen is an interventional radiologist, the specialty to which Dr. Aitken admitted he must defer in certain aspects of his testimony. Dr. Teigen not only disputed the length of the catheter fragment, but essentially disagreed with every aspect of Dr. Aitken's testimony. Dr. Teigen testified, to a reasonable degree of medical certainty, that the catheter fragment migrated not later than September 3, 1997, when the catheter was removed. He testified that the most serious risk of a catheter fracture is arrhythmia as the fragment travels through the heart, which occurs relatively quickly, and the migration typically goes unnoticed by the patient. He further testified that a catheter passing through the heart can cause an irregular or erratic heartbeat, but once it has passed through the heart, that risk no longer exists. In his opinion heart attacks do not occur when the catheter passes through the heart, and Devine's fainting spells were not likely caused by the fragment. Again to a reasonable degree of medical certainty, Dr. Teigen testified that it is physiologically impossible for the catheter, in its current location, to cause arrhythmia. Nor could the anterior portion of the catheter "flip-out" and cause problems in Devine's heart, as testified by Dr. Aitken, simply because blood flow would prevent such movement. Dr. Teigen further opined that it is medically impossible for Devine to feel the catheter inside his chest, given the lack of nerve endings in the blood vessels. Dr. Teigen opined that the catheter fragment is fully incorporated into the intima and the risk of infection is significantly less than that posed by the

7

presence of other foreign bodies, including shrapnel. Finally, Dr. Teigen found no evidence of migration or erosion since the catheter fragment was first discovered in 2001, and he opines the catheter fragment will not impact Devine's health in the future.

On cross-examination Devine's counsel attempted to make Dr. Teigen address the psychological aspects of the definition of "health." Dr. Teigen resisted, and the court finds he is not qualified to express an opinion on the emotional effects the retained catheter fragment has caused Devine. Further, Devine's attempt to discredit Dr. Teigen's testimony by asking him for a guarantee of no harm is somewhat disingenuous when Dr. Aitken could not quantify probabilities of harm. Guarantees are not the standard in a medical malpractice case. On numerous occasions respected physicians, and particularly Dr. Sammy Campbell, in whom Devine placed considerable trust, have told him the catheter should remain where it is, that it is thrombosed off, that it has not moved since reaching his pulmonary artery, and will not move. Only Dr. Aitken has told him otherwise, and in so doing has unreasonably fueled Devine's anxiety. The court concludes from all the evidence it is more likely than not that Devine has not experienced, and will not experience, any physical complications as a result of the catheter fragment.

III. <u>Emotional and Psychological Harm</u>

The court now turns to the emotional harm element in its consideration of causation. On this issue the court has also undertaken a thorough review of Devine's testimony, treatment records and the expert opinions offered by the parties. In doing so, the court finds that the United States' failure to remove the entire catheter has detrimentally affected Devine psychologically.

Devine testified he has experienced fear and anxiety since learning of the catheter's presence, stating "I get thinking too much and I get afraid. I have fear and I get anxious. I just wonder is it going to move today? I don't wonder ... if it's going to happen, I wonder when it's

8

going to happen. When I feel the pain, I get excited." He expressed concern about whether he has lived his life the way he was planning, whether he has spent enough time with his children, whether he has said what he wants to say and "done good enough." He also stated he feels exhausted because he is not able to sleep, stating, "My mind gets racing and I can't concentrate. Thinking too much and have trouble sleeping." Additionally, he stated he is having trouble coming "to peace with it," in light of his "fear that it will rupture or [he'll] get an infection or have a stroke from a clot."

Prior to learning of the catheter's presence, Devine had sought counseling with Mary Alexander ("Alexander") at Sierra Family Associates, commencing in February 2001 on referral from the VA. Alexander diagnosed him with PTSD and recognized he was experiencing a great deal of survivor guilt. He was also experiencing emotional and mental distress from a number of other significant relational concerns. He had other family issues, not the least of which was a divorce after 27 years of marriage, fathering a child out of wedlock with a woman who ultimately terminated contact with him, having both a daughter and a brother undergo treatment for cancer, and struggling with health concerns, including his weight, combat injuries, and back problems. He continued with counseling following discovery of the catheter fragment until February 26, 2003, at which time he discontinued, stating he was doing so "because of this thing in my chest." Ex 101.

The following excerpt from of Sierra Family Associates treatment notes of November 28, 2001 illustrates how the catheter fragment has weighed on Devine's mind:

> He has had major medical issues regarding an implant done in 1997 in the VA in Fargo. It was a "port cath" (portable catheter) designed to administer medication. A 4" long tube was left in when the device was removed in the spring of 1998. It has migrated into major arteries from his heart on his upper left side. He has had

9

>  multiple symptoms but with no awareness of the cause. This
>  malpractice incident was discovered by the X-ray technician.
>  Follow up x- rays confirmed that the tube is 'stuck' and 'grown' into
>  two pulmonary arteries and has blocked those arteries. He has been
>  told that surgery to correct and remove it isn't possible and the tube
>  can't migrate further. He's also been told that if the tube should
>  wear and rupture he would die instantly. He has been told he has a
>  clear case of malpractice but can't locate a lawyer willing to take his
>  case because the law restricts suits to 25% take by attorneys. A
>  [Assessment] Predictably he is obsessing over the uncertainty of his
>  situation. He's angry and feels betrayed at having served his
>  country well and been seriously wounded in combat only to
>  encounter this coverup of medical bungling by the VA. P [Plan]
>  Support his hope of finding an attorney and striving for
>  compensation for his disablement.

On February 19, 2002 Mary Alexander noted, "Hugh is frustrated that he's been getting little help from the VA regarding his medical condition. So far there has been no effort to make a treatment plan for the tube in his artery. He can't get anyone willing to take responsibility." On March 5, 2002 she noted, "He feels incapable of undertaking anything that might be physically taxing. He has an abiding fear that the tube in his chest could bring on a heart attack at anytime. He finds it difficult to concentrate, to read or study." On April 2, 2002 she wrote, "He also has ongoing anxiety about the tube in his chest. He's been told if he were to have an aneurism he'd be dead instantly. He is trying to determine how he should be living his life. He's wondering if he is living productively." On May 2, 2002 Devine again discussed with Mary Alexander the tube's presence: "He spoke of his concern for his condition regarding the tube stuck in his arteries. He has constant awareness of it and fear it could cause his death at any moment. He is frustrated at being unable to get any doctor to do a CAT scan. The x-rays can't reveal tissue damage." Again on May 9, 2002 he discussed the catheter fragment: "He continues to have heightened anxiety regarding the risk of an aneurism due to the tube lodged in his chest. He tries to push it out of his

10

thoughts but every twinge or tight breath reminds him.... P [plan] Assure him that I will provide as much documentation as I can for his claim."

Mary Alexander retired in May 2002. Devine continued to meet with Alexander's associate, JoLynne Buehring, for a brief time, but he testified he never "made a connection" with her. In any event, the few times they met they discussed the presence of the retained catheter fragment and its effect on his emotional well-being. On June 26, 2002 Buehring wrote, "Tube in heart causing most problems, 3 ½ -4 in long, blocking pulmonary artery. Has traveled thru the heart. Too dangerous to remove. Lawsuit pending. Left side feels labored when breathing. Needs questions answered.... He is very concerned and anxious about health situation, with out pain but constant reminders of feelings of pressure in left chest." Buehring note, following a July 16, 2002 session: "Set up to see Dr. Campbell, Chief of Pulmonology, July 22. Worries about object in chest, wants to know bottom line." This statement is in Buehring's October 4, 2002 notes: "Attorney said not to leave town for even a day. Got some records that were stored 'pot of gold.' Had been doing fairly well until chest tube. Uncertainty of potential harm caused by tube in chest has hindered even enjoyment of today, fears of heart attack, impotence due to fears." Again on November 14, 2002 Buehring wrote, "Lot more anxiety, fear, not sleeping right, upset and fearful of thing in his chest, any pain causes fear."

The existence of the tube, although obviously not Devine's only concern, is prevalent throughout the treatment discussion notes. JoLynne Buehring again noted Devine's anxiety on November 26, 2002, writing, "Nightmare so bad he bit his lip. Surrounded by enemy; more dreams because of chest prob." On January 3, 2002 she wrote, "Has been obsessing about object in chest, fearing it will break loose. Mind racing, hard to rest. Just got more papers re: lawsuit. Discussed how he focuses on object in chest when family is chaotic or rel. is bad, fearing death,

11

but at same time not wanting 'to live' this way,... ." And finally, on March 25, 2003 she wrote, "Phone message that he feels he should stop coming for counseling because of 'the thing in my chest and lots of things going on right now,' I'm concerned about his mental health, particularly in light of current war news. Will call him to check."

Alexander testified consistent with her treatment records. She confirmed the diagnosis of PTSD, explaining:

> It's an assortment of symptoms and behavioral changes resulting from a major trauma that is outside the norm of common experience. It often is considered that the trauma must be life-threatening or perceived to be life-threatening for it to constitute major trauma that could lead to the diagnosis of post traumatic stress disorder. As has been testified earlier, we all experience stress and often traumatic stress. People who have acceptable coping skills are able to recover from reasonable stress, even minor car accidents aren't likely to cause long term PTSD. But if the individual is not able to recover within a matter of weeks or months, we would have to look at the probability that indeed they are experiencing PTSD.

She also testified that Devine had come to terms with his divorce, "both with regard to any lingering obligation to his former wife and as that related to the relationships she had with their children and that the family had as a whole." She elaborated further on the primary issues discussed during their sessions, stating, "He also talked about his concern certainly for his daughter Shanon who at the time they had not explored the full extent of her health issues, but he was deeply concerned for her and for a brother that was diagnosed with cancer. So these things were all aspects of what Mr. Devine presented as concerns in addition to the issues relating to his combat generated PTSD." She testified that prior to discovery of the retained catheter he was exhibiting diminished symptoms of PTSD "and in fact had stopped reporting some of those symptoms as not occurring. And that was significant progress because we don't think much

PTSD as being curable. What we attempted to do is to relieve the intensity of the troubling symptoms and that was happening with Mr. Devine."

In discussing the first session in which Devine told her about the catheter fragment, she noted that he showed anger, an emotion he had not previously displayed. She testified he was feeling frustrated, and he thought the VA was attempting to cover up its medical bungling. He reported intensified bad dreams, and when he was awake he had intrusive thoughts. Alexander opined that some of those intensified thoughts went back to his combat experiences:

> [T]hat was not unreasonable to anticipate because any time there is a new trauma on top of old traumas, it tends to tap those old leftover pieces of baggage, if you will. And I've seen this in other veterans. They may have dealt very satisfactorily with the immediate symptoms of their combat stress, but if they go through the loss of an infant or a divorce, totally unrelated to their combat experience, they may find themselves generating more images and intrusive thoughts hashing back to the combat and this seemed to be the case with Mr. Devine.

Finally, she opined that the discovery of the catheter fragment was a "definite set-back."

Cross-examination did little to discredit Alexander's testimony. The court found Alexander to be honest and forthright. The fact that Devine was experiencing other issues affecting his mental health, and that he raised those issues frequently during his treatment sessions, does not distract from Alexander's opinion that the catheter fragment has significantly negatively impacted Devine's emotional well being. Alexander noted that as a Marine Devine exhibits a certain degree of stoicism, and she emphasized that the extent of impact may well be greater than he has revealed.

Again the parties offered polarized expert testimony as to whether Devine suffered psychological injury from the presence of the catheter fragment. Dr. Jane McNaught testified for plaintiff that the discovery of the catheter fragment has caused Devine permanent psychological injury:

13

> Mr. Devine's testing, as well as my interviews with him, suggest that on a daily basis he's concerned about the possibility of death related to the catheter segment remaining inside him. He worries about doing any extensive physical exercise for fear of dislodging the catheter segment. He fears involvement, marital involvement with a woman for fear that he would die and she would end up either being widowed or alternatively that he would be even more physically disabled and she would have to take care of him. He has, like I say, a shortened view of his life. It has resulted in a great deal of depression and anxiety for him on a day-to-day basis and in terms of his own family involvement with his children and grandchildren, Mr. Devine is very concerned about leaving his grand - - particularly his grandson who has no involvement with his father without him, as well as his children who one of which has significant medical problems.

She diagnosed Devine as suffering from a major depressive disorder, post-traumatic stress disorder as a result of his combat experience and the catheter fragment, and an anxiety disorder due to his medical condition. She further testified that the discovery of the catheter fragment exacerbated his preexisting problems. She noted that prior to the discovery, he had made progress with his PTSD symptoms related to combat and reached a point of "being relatively stabilized." Recognizing that despite his treatment he was not functioning perfectly or without anxiety, Dr. McNaught testified consistent with Alexander that Devine had accommodated quite well. Dr. McNaught opined that now, instead of having one source of PTSD, Devine has two major sources of PTSD "related to this constant fear of somehow possibly dying, dislodging the catheter or having the catheter become infected, all sorts of concerns essentially for his life." She also discussed Devine's lack of confidence in continuing to receive medical care at the VA. Dr. McNaught concluded that Devine was not feigning or malingering, and if anything, he was minimizing the emotional and psychological aspects of the harm caused by the catheter fragment, despite the secondary gain possible from litigation and the obvious references to the same in Alexander's treatment notes.

Dr. Barbara Long, the United States' psychological expert, ineffectively attempted to discredit Dr. McNaught's testimony. In essence, Dr. Long found Devine suffered from no new psychiatric disorders as a result of the fragment, and that his problems are chronic, waxing and waning over time. Disagreeing with Dr. McNaught, she opined that Devine does not suffer from major depression. Dr. Long did not quarrel with the diagnosis of PTSD and did not deny exacerbation of his PTSD by the new "trauma." Like Dr. McNaught, Dr. Long recommended that Devine recommence therapy to help him better cope with his PTSD.

Although the testimony of the two mental health experts conflicts significantly, the testimony and common sense indicate Devine has suffered emotional harm resulting from the catheter fragment. Devine has clearly suffered an exacerbation of his existing PTSD. The court finds a causal link between the VA's violation of the standard of care in failing to remove the entire catheter and the emotional distress suffered by Devine. The court now turns to the issue of damages.

IV.   <u>Damages</u>

At trial, Devine testified:

For me I feel like I fought for freedom and now I've lost my freedom. I don't get that freedom from the anxiety. I don't get freedom from fear, freedom of stress. Just doesn't go away.

This statement raises a number of questions the court must address in determining an appropriate damage amount. Is this fear reasonable? How much is this fear worth? Should Devine have taken steps to reduce the fear or handled the fear differently?

Devine suffered from pre-existing PTSD. His therapy with Mary Alexander effectively addressed the intensity of the episodes and his overall health; yet his PTSD condition remained. The court finds Devine's emotional reaction to the presence of the catheter fragment has

15

exacerbated his pre-existing PTSD. His reaction was initially reasonable, but it has become less reasonable with the passage of time. Unfortunately, Devine's emotional despair led him to discontinue counseling after he learned of the catheter fragment, resulting in impaired mental health, with little chance of improvement unless he resumes treatment. Going forward, Devine must assume responsibility for getting the therapy he needs. He suffers no physical health risk and can effectively manage his emotional health through counseling.

Devine has suffered no wage loss, given his disability status. The evidence supports only an award of emotional distress damages, primarily for the past and only minimally for the future. The court finds he has suffered damages in the amount of $150,000 for past emotional distress and $50,000 for future emotional distress.

**IT IS ORDERED** that judgment be entered in favor of plaintiff in the amount of $200,000.

Dated this 21st day of December, 2005.

/s/ Karen K. Klein
Karen K. Klein
United States Magistrate Judge